**AMERICAN RADIATOR & STANDARD SANITARY CORPORATION**

v.

The **UNITED STATES.**

No. 295–59.

United States Court of Claims.

June 7, 1963.

As Amended Aug. 29, 1963.

M. Bernard Aidinoff, New York City, for the plaintiff. Norris Darrell, Kendyl K. Monroe and Sullivan & Cromwell, New York City, were on the briefs.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for the defendant.

Before JONES, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

The only contested point in this suit for refund of income and excess profits taxes is the timeliness of plaintiff's refund claim. The defendant does not deny that the taxes were overpaid, but it contends that recovery is now barred because the formal claim for refund came some months too late. We reject the defense and hold that plaintiff made a seasonable demand.

For the span of years beginning with 1941, plaintiff duly elected to use the "last in, first out" ("Lifo") method of inventorying goods under Section 22(d) ("method of inventorying goods") of the Internal Revenue Code of 1939; in particular, plaintiff chose to come under Section 22(d) (6), relating to the involuntary liquidation and replacement of inventory for the years from 1941 to 1948.[1] The general scheme of this inventory system was that a taxpayer was entitled, in defined circumstances, to consider inventory lost or left unreplaced in those eight years because of "war conditions"—i. e., involuntarily liquidated—

1. Section 22(d) (6) provides in pertinent part:

"(6) *Involuntary liquidation and replacement of inventory.*

"(*A*) *Adjustment of net income and resulting tax.—Years beginning prior to January 1, 1948.* If, for any taxable year beginning after December 31, 1940, and prior to January 1, 1948, the closing inventory of a taxpayer inventorying goods under the method provided in this subsection reflects a decrease from the opening inventory of such goods for such year, and if the taxpayer elects, at such time and in such manner and subject to such regulations as the Commissioner with the approval of the Secretary may prescribe, to have the provisions of this paragraph apply, and if it established to the satisfaction of the Commissioner, in accordance with such regulations, that such decrease is attributable to the involuntary liquidation of such inventory as defined in subparagraph (B), and if the closing inventory of a subsequent taxable year, ending prior to January 1, 1953, reflects a replacement, in whole or in part, of the goods so previously liquidated, the net income of the taxpayer otherwise determined for the year of such involuntary liquidation shall be adjusted as follows:

"(i) Increased by an amount equal to the excess, if any, of the aggregate cost of such goods reflected in the opening inventory of the year of involuntary liquidation over the aggregate replacement cost; or

"(ii) Decreased by an amount equal to the excess, if any, of the aggregate replacement cost of such goods over the aggregate cost thereof reflected in the opening inventory of the year of the involuntary liquidation.

The taxes imposed by this chapter and by chapter 2 for the year of such liquidation, for preceding taxable years, and for all taxable years intervening between the year of liquidation and the year of replacement shall be redetermined, giving effect to such adjustments. Any increase in such taxes resulting from such adjustments shall be assessed and collected as a deficiency but without interest, and any overpayment so resulting shall be credited or refunded to the taxpayer without interest.

"(*B*) *Definition of involuntary liquidation.* The term 'involuntary liquidation', as used in this paragraph, means the sale or other disposition of goods inventoried under the method described in this subsection, either voluntary or involuntary, coupled with a failure on the part of the taxpayer to purchase, manufacture, or otherwise produce and have on hand at the close of the taxable year in which such sale or other disposition occurred such goods as would, if on hand at the close of such taxable year, be subject to

to have been replaced in a subsequent taxable year (prior to 1953) by new goods, generally at higher cost. In that event, there was to be an exchange of costs between the liquidated and the replacement goods, and two tax adjustments would follow: (1) the income for the year of involuntary liquidation was to be decreased by the excess cost of replacement (the amount by which the cost of the replacement goods exceeded the cost of the liquidated goods) and the tax liability for that year redetermined;[2] and (2) the replacement goods were to be included in the purchases and inventory for the year of replacement at the inventory cost basis of the goods replaced.

In 1942, 1943, and 1945, plaintiff's closing inventories of certain goods reflected a decrease, attributable to such "involuntary liquidation", from its opening inventories for those years. Replacements of these involuntarily liquidated

the application of the provisions of this subsection, if such failure on the part of the taxpayer is due, directly and exclusively, (i) to enemy capture or control of sources of limited foreign supply; (ii) to shipping or other transportation shortages; (iii) to material shortages resulting from priorities or allocations; (iv) to labor shortages; or (v) to other prevailing war conditions beyond the control of the taxpayer.

"(C) *Replacements.* If, in the case of any taxpayer subject to the provisions of subparagraph (A), the closing inventory of the taxpayer for a taxable year, subsequent to the year of involuntary liquidation but prior to the complete replacement of the goods so liquidated, reflects an increase over the opening inventory of such goods for the taxable year, the goods reflecting such increase shall be considered, in the order of their acquisition, as having been acquired in replacement of the goods most recently liquidated (whether or not in a year of involuntary liquidation) and not previously replaced, and if the liquidation was an involuntary liquidation shall be taken into purchases and included in the closing inventory of the taxpayer for the year of replacement at the inventory cost basis of the goods replaced.

"(D) *Election irrevocable.* An election by the taxpayer to have the provisions of this paragraph apply, once made, shall be irrevocable and shall be binding for the year of the involuntary liquidation and for all determinations for prior and subsequent taxable years insofar as they are related to the year of liquidation or replacement.

"(E) *Adjustment in certain cases.* If the adjustments specified in subparagraph (A) are, with respect to any taxable year, prevented, on the date of the filing of the income tax return of the taxpayer for the year of the replacement, or within three years from such date, by any provision or rule of law (other than this sub-paragraph and other than section 3761, relating to compromises), such adjustments shall nevertheless be made if, in respect of the taxable year for which the adjustment is sought, a notice of deficiency is mailed or a claim for refund is filed, as the case may be, within three years after the date of the filing of the income tax return for the year of replacement. If, at the time of the mailing of such notice of deficiency or the filing of such claim for refund, the adjustment is so prevented, then the amount of the adjustment authorized by this paragraph shall be limited to the increase or decrease of the tax imposed by this chapter and Chapter 2 previously determined for such taxable year which results solely from the effect of subparagraph (A), and such amount shall be assessed and collected, or credited or refunded, in the same manner as if it were a deficiency or an overpayment, as the case may be, for such taxable year and as if, on the date of the filing of the income tax return for the year of the replacement, three years remain before the expiration of the periods of limitation upon assessment or the filing of claim for refund for the taxable year. The tax previously determined shall be ascertained in accordance with section 734(d). The amount to be assessed and collected under this paragraph in the same manner as if it were a deficiency or to be credited or refunded in the same manner as if it were an overpayment shall not be diminished by any credit or set-off based upon any item, inclusion, deduction, credit, exemption, gain, or loss, other than one resulting from the effect of subparagraph (A). Such amount, if paid, shall not be recovered by a claim or suit for refund, or suit for erroneous refund based upon any item, inclusion, deduction, credit, exemption, gain, or loss, other than one resulting from the effect of subparagraph (A)."

2. If the replacement goods were lower-cost, the income of the liquidation year would be increased.

inventories were made in later years, including 1949, at excess costs. Plaintiff made the adjustments required by Section 22(d) (6) (A) and (C) for the years of liquidation and replacement; it found itself entitled to refunds of income and excess profits taxes for 1942, 1943, and 1945 (the liquidation years) on account of goods replaced in 1949 (the replacement year for this case).

Under the special provisions of Section 22(d) (6) (E) (see footnote 1, supra), if such adjustments for a liquidation year are prevented by the normal statute of limitations, the taxpayer is nevertheless allowed to take advantage of a favorable adjustment if a claim for refund is made within three years after the date of filing of its income tax return for the *replacement* year. Plaintiff filed its return for 1949 (the replacement year) on March 15, 1950. In December 1952, the parties extended, by proper agreement, the time for the assessment of additional income taxes for 1949 to June 30, 1954; this agreement had the effect, under Section 322(b) (3) of the 1939 Code, of extending until December 31, 1954, the time within which plaintiff could file claims for refund of its 1949 income taxes.

Plaintiff did not file formal claims for refund of the overpayments of its taxes for 1942, 1943, and 1945 (resulting from its excess cost of replacement in 1949) until May 1953 and January 1954—more than three years after March 15, 1950. In 1958, these claims were finally rejected by the Internal Revenue Service as untimely.

■■ This conclusion is attacked on alternative grounds.[3] One is that the formal refund claims for *1942, 1943, and 1945* were covered by the agreed extension of time to December 31, 1954, for filing refund claims for *1949* taxes. That agreement, which was made under Section 276(b) [4], operated under Section 322 (b) (3) [5] to postpone to the end of 1954 the time within which plaintiff could file its refund claims for 1949 taxes. There is no explicit qualification comparable to Section 322(b) (3) in Section 22(d) (6) (E) (footnote 1, supra), which establish-

3. We consider only two of these grounds.

4. Section 276(b) provided:
    "(b) *Waiver.* Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon."
    Section 275(a) provided:
    "(a) *General rule.* The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period."

5. Section 322(b) (1) and (3) provided in pertinent part:
    "(b) *Limitation on allowance*
    "(1) *Period of limitation.* Unless a claim for credit or refund is filed by the taxpayer within three years from the time the return was filed by the taxpayer or within two years from the time the tax was paid, no credit or refund shall be allowed or made after the expiration of whichever of such periods expires the later. If no return is filed by the taxpayer, then no credit or refund shall be allowed or made after two years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer.
    \* \* \* \* \*
    "(3) *Exceptions in the case of waivers.* If both the Commissioner and the taxpayer have, within the period prescribed in paragraph (1) for the filing of a claim for credit or refund, agreed in writing under the provisions of section 276(b) to extend beyond the period prescribed in section 275 the time within which the Commissioner may make an assessment, the period within which a claim for credit or refund may be filed, or credit or refund allowed or made if no claim is filed, shall be the period within which the Commissioner may make an assessment pursuant to such agreement or any extension, thereof, and six months thereafter, except that the provisions of paragraph (1) shall apply to any claim filed, or credit or refund allowed or made, before the execution of such agreement.
    \* \* \* "

es the period for seeking refunds for liquidation years; the latter simply provides that if the adjustments to be made in the tax for the liquidation years are barred by the time of the replacement year the taxpayer's period for filing the refund claim will be extended to "three years after the date of the filing of the income tax return for the year of replacement." It is appropriate, however, to imply the condition that, if the parties prolong the time for filing refund claims for the replacement year beyond the statutory three-year period, the date for refund claims for the liquidation year will also be stretched to the same extent.

The reason why it is sound to add this qualification to the bare words of the Code is that a refund under Section 22 (d) (6) for the liquidation year is intimately linked, in practice and by the statute, to the return and the tax for the replacement year. The right to an adjustment for the earlier period cannot arise until the replacements are made; the existence and amount of the permissible adjustment depend upon the aggregate replacement cost, as accepted for tax purposes; if that replacement cost should be altered (e. g., as a result of a Revenue Service audit) the adjustments for the liquidation years could well be affected (in addition to the tax for the replacement year itself). Congress recognized this close, almost inseparable, relationship by fixing the time for filing refund claims for the liquidation year[6] as the same three-year period during which the taxpayer could demand refunds for the replacement year (under Section 322(b) (1)) and the Internal Revenue Service could assess additional taxes for that year (under Section 275 (a)). Where that three-year period has been extended for the taxes of the replacement year, it is sensible to prolong it, also, for refunds and deficiency assessments for the liquidation year. Otherwise it might not be possible to take account for the earlier period of a change in the figures for the replacement year made, for instance, as a result of a Government audit of the later return which was conducted within the extended period but after the original three years. There is a reciprocal connection between the two years—liquidation and replacement—which calls for coordination between their respective limitation periods.

Defendant's stark reply is that Congress did not so provide and we are powerless to fill the gap. Congress did not say so in terms, but we are given no reason why it would have wished to confine the refund or assessment period for the liquidation year to three years, even though the similar period for the necessarily-related replacement year had been extended.[7] Where all the pertinent considerations push toward a single goal and only the literal words of the legislation seem to bar the way, it is proper to search hard for an opening through which to pass along the indicated road. We think that such an opening exists in this case. The form of words may have been awkwardly chosen, but when Section 22(d) (6) (E) makes a refund claim or deficiency assessment for the liquidation year timely if made "within three years after the date of the filing of the income tax return for the year of replacement"—the ordinary period for further assessments or refund claims for the year of replacement—it is quite possible to understand Congress as designating nothing less than the full period prescribed by Section 275(a), 276(b) and 322(b) (1) and (3) (footnotes 4, 5, supra) for filing a refund claim or levying a deficiency for the replacement year. The reference to the normal three-year span could well stand, elliptically, for its appendages as well. We take it that that is what the statute means, and therefore hold that plaintiff's formal refund claims were timely.

---

6. As well as the time during which the Commissioner of Internal Revenue could assess further taxes for the liquidation year.

7. No relevant legislative history has been offered.

■ An independent basis for deciding that plaintiff is not barred is that it made a timely *informal* claim for refunds for the liquidation years (1942, 1943, and 1945) within three calendar years of the filing of its tax return for 1949 (the year of replacement). Informal refund claims have long been held valid (United States v. Kales, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941), and cases cited). But they must have a written component (Sicanoff Vegetable Oil Corp. v. United States, 181 F.Supp. 265, 149 Ct.Cl. 278, 286 (1960); Wrightsman Petroleum Co. v. United States, 35 F.Supp. 86, 96, 92 Ct.Cl. 217, 238 (1940), cert. denied, 313 U.S. 578, 61 S.Ct. 1095, 85 L.Ed. 1535 (1941)), and should adequately apprise the Internal Revenue Service that a refund is sought and for certain years. Newport Industries, Inc. v. United States, 60 F.Supp. 229, 104 Ct.Cl. 38 (1945); Rosengarten v. United States, 181 F.Supp. 275, 278-279, 149 Ct.Cl. 287, 293-294, (1960), cert. denied, 364 U.S. 822, 81 S.Ct. 60, 5 L.Ed.2d 53; Newton v. United States, 163 F.Supp. 614, 619, 143 Ct.Cl. 293, 300 (1958); Sweeney v. United States, Ct.Cl. No. 188-55, decided Jan. 18, 1961, 285 F.2d 444, 446; Philipsborn v. United States, 53 F.2d 133, 138-139, 72 Ct.Cl. 545, 554-55 (1931), cert. denied, 285 U.S. 548, 52 S.Ct. 405, 76 L.Ed. 939 (1932). It is not enough that the Service have in its possession information from which it might deduce that the taxpayer is entitled to, or might desire, a refund; nor is it sufficient that a claim involving the same ground has been filed for another year or by a different taxpayer. Rosengarten v. United States, supra; Byron Weston Co. v. United States, 87 F.Supp. 955, 956-957, 115 Ct.Cl. 232, 234-235 (1950). On the other hand, the writing should not be given a crabbed or literal reading, ignoring all the surrounding circumstances which give it body and content. The focus is on the claim as a whole, not merely the written component. See Newton v. United States, supra, 163 F.Supp. at 619, 143 Ct.Cl. at 300 (1958); Higginson v. United States, 81 F.Supp. 254, 267-268, 113 Ct.Cl. 131, 157-158 (1948). In addition to the writing and some form of request for a refund, the only essential is that there be made available sufficient information as to the tax and the year to enable the Internal Revenue Service to commence, if it wishes, an examination into the claim.

Under these standards, and in the light of the particular circumstances, this court has found informal refund claims based upon an objection on the back of a check paying the tax (Night Hawk Leasing Co. v. United States, 18 F.Supp. 938, 84 Ct.Cl. 596 (1937)); written protests prior to payment (Newton v. United States, supra); a letter of transmittal accompanied by an executed waiver of restrictions on assessment (Cumberland Portland Cement Co. v. United States, 104 F.Supp. 1010, 122 Ct.Cl. 580, 591-592 (1952)); and on an executed waiver subject to special conditions (Stuart v. United States, 130 F.Supp. 386, 131 Ct. Cl. 174 (1955)). See, also, Crenshaw v. Hrcka, 237 F.2d 372 (C.A. 4, 1956), affirming 140 F.Supp. 350 (E.D.Va., 1956) (letter agreeing to installment plan for paying taxes); and Neilson v. Harrison, 131 F.2d 205 (C.A. 7, 1942) (conditional waiver).

■ On what can our plaintiff rely to demonstrate that it made an informal claim prior to March 15, 1953 (i. e., "within three years after the date of the filing of the income tax return for the year of replacement")? The chief written component consisted of various notations and figures on its income tax return for 1949. One schedule of that return listed an item of $750,000 as "Estimated Refund Federal Taxes—Re: 'Lifo' Inventory"; another schedule listed the sum of $965,193.72 for "Excess Cost of Replacements—Re: 'Lifo' Inventory"; and still another schedule indicated that the increase during 1949 in "Federal Taxes Refundable" was $750,000 (the same figure as the taxes refundable "Re 'Lifo' Inventory"). These parts of the return were sufficient to satisfy the requirement that there be a written element in the informal demand. If there

were nothing else, perhaps these notations would not have been adequate by themselves to create a valid informal claim, but with their explicit references to tax refunds, "Lifo" inventory, and excess cost of replacements they certainly supplied enough of an underpinning.[8]

For the rest, plaintiff can properly rely on the very specific knowledge gained by the revenue agent in auditing its returns for 1949 and 1950. This agent was thoroughly familiar with plaintiff's tax problems; he audited its returns for each year prior to 1949, beginning with 1940 or 1941. Significantly, he completed his audit of 1942, 1943, and 1945 (the liquidation years for which refunds are now sought) before March 15, 1953; he likewise finished his audit of 1949 and 1950 and made his reports before that critical date. Our detailed findings show that, in the course of his thorough examination of the 1949 and 1950 returns, the agent clearly came to know that plaintiff had had involuntary liquidations in 1942, 1943, and 1945 (among other years); that it had elected to come under Section 22(d) (6) of the 1939 Code for those years; and that it believed itself entitled to, and expected, a certain sum in refunds for those (and other) years on account of replacements made in 1949. The agent's reports of his examination of the 1949 and 1950 returns plainly revealed, in computations and breakdown of items, his recognition that plaintiff affirmatively anticipated such refunds. Headings in both reports referred expressly to expected refunds for earlier years due to replacements in 1949; the agent also made adjustments in the 1950 tax which were affected by his acceptance of these anticipated refunds. In addition, he thought that formal refund claims would be filed and that he would consider them. There can therefore be no doubt that, before the

expiration of the three-year period, a responsible employee of the Internal Revenue Service had "notice fairly advising the Commissioner of the nature of the taxpayer's claim." United States v. Kales, supra, 314 U.S. at 194, 62 S.Ct. at 218.

The defendant objects that this informal claim—reflected in plaintiff's returns for 1949 and 1950, taken together with the revenue agent's knowledge— did not give the Service such important prerequisites as the years for, or the amounts in, which the refunds were being sought, or the costs of the various inventories for each year. However, the Trial Commissioner has found that, by the time the agent had concluded his audits, he knew (i) that plaintiff desired refunds resulting from 1949 replacements of involuntary liquidations in 1942–1947; (ii) the approximate total amount of the refund expected, and (iii) the aggregate excess cost of the 1949 replacements. The testimony and the documentary evidence support these findings, and we adopt them. In sufficient degree, the agent had before him the very elements defendant says were missing; plaintiff was not required, for this informal claim for refunds all of one type, to match particular amounts to particular years, or to point out that *this* claim related only to 1942, 1943, and 1945 (not to 1944, 1946 or 1947).[9] An informal claim which is partially informative may be treated as valid even though "too general" or suffering from a "lack of specificity"—at least where those defects have been remedied by a formal claim filed after the lapse of the statutory period but before the rejection of the informal request. United States v. Kales, supra, 314 U.S. at 194, 62 S.Ct. at 218. Plaintiff's formal refund claims (in May 1953 and January 1954) were admittedly com-

8. There were less explicit notations in plaintiff's income tax return for 1950 which added to the information made available to the Service.

9. Plaintiff says that the computations in the agent's reports show that he must have known (i) the precise amount claimed for each year and (ii) the exact years in question. We need not pass upon this contention.

plete and they were filed well before the rejections of all claims in 1955 and 1958. Any irregularities in the informal claim were thus cured retroactively. United States v. Memphis Cotton Oil Co., 288 U.S. 62, 71–72, 53 S.Ct. 278, 77 L.Ed. 619 (1933); United States v. Kales, supra; Jones v. United States, 5 F.Supp. 146, 150, 78 Ct.Cl. 549, 557 (1933), cert. denied, 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934); Higginson v. United States, supra, 81 F.Supp. 254, 268, 113 Ct.Cl. 131, 158 (1948); Cumberland Portland Cement Co. v. United States, supra, 104 F.Supp. 1010, 1015, 122 Ct.Cl. 580, 593–594 (1952); Newton v. United States, supra, 163 F.Supp. 614, 619, 143 Ct.Cl. 293, 301 (1958); Rosengarten v. United States, supra, 181 F.Supp. 275, 278–279, 149 Ct.Cl. 287, 293 (1960), cert. denied, 364 U.S. 822, 81 S.Ct. 60, 5 L.Ed. 2d 53; Hrcka v. Crenshaw, supra, 140 F.Supp. 350, 352–353 (E.D.Va., 1956), aff'd 237 F.2d 372 (C.A. 4, 1956). It is irrelevant that the formal demands did not refer to the informal claim and were not designated as amendments. Whatever the nomenclature, they supplied the missing information before the Revenue Service had rejected the informal claim, and were therefore equivalent to amendments in substance.

None of this court's earlier decisions is inconsistent with our holding that plaintiff made a valid informal claim before March 15, 1953. Defendant cites Rosengarten v. United States, supra, 181 F.Supp. at 279, 149 Ct.Cl. at 294 (1960), and Sicanoff Vegetable Oil Corp. v. United States, supra, 181 F.Supp. at 269, 149 Ct.Cl. at 286 (1960), but neither case is at loggerheads with what we decide today. Rosengarten involved a claim by another taxpayer for a different year; Sicanoff involved an alleged informal claim based solely on oral conversations with a revenue agent and without any written component. Nor do we know of any conflicting ruling by any other court. The closest is Tobin v. Tomlinson, 310

F.2d 648 (C.A. 5, 1962), but in that case there was no showing (so far as appears) that the Internal Revenue Service had, before the lapse of the limitations period, detailed information of the kind which was known to the agent here before March 15, 1953; moreover, the alleged informal claim was rejected there before the filing of the belated formal claim.

On both grounds, we conclude that the plaintiff made a timely refund claim and is entitled to recover. Judgment is entered to that effect. The amount of recovery will be determined under Rule 38(c).[10]

---

10. We leave to the Rule 38(c) proceeding the parties' dispute as to whether plaintiff has already received the $1,802.47 refund it claims with respect to 1945 income taxes.